885 F.2d 1
 12 U.S.P.Q.2d 1368
 MANHATTAN INDUSTRIES, INC., Bayard Shirt Corporation, and
Don Sophisticates, Inc., Plaintiffs,
v.
SWEATER BEE BY BANFF, LTD., and Robert Belsky, Defendants.
SWEATER BEE BY BANFF, LTD., Contempt-Plaintiff-Appellant,
v.
MANHATTAN INDUSTRIES, INC., Bayard Shirt Corporation,
Champpierre, Ltd., Laurence L. Leeds, Jr., Donald
Kallman, Robert Hamel, and Fred
Feldstein, Contempt-Defendants,
Manhattan Industries, Inc., Bayard Shirt Corporation, Donald
Kallman, and Robert Hamel, Contempt-Defendants-Appellees.
 No. 893, Docket 88-7810.
 United States Court of Appeals,
Second Circuit.
 Argued April 4, 1989.
Decided Sept. 15, 1989.
 
 Dennis Grossman, New York City (Eileen King, Grossman & King, New York City, of counsel), for contempt-plaintiff-appellant.
 Thomas J. Sweeney, III, New York City (Cynthia A. Feigin, Davis, Markel & Edwards, Paul Fields, McAulay, Fields, Fisher, Goldstein & Nissen, New York City, of counsel), for contempt-defendants-appellees.
 Before LUMBARD, PRATT and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 This is an appeal from a judgment entered in the United States District Court for the Southern District of New York (Broderick, J.) that approved and adopted a report of a special master finding the Bayard Shirt Corporation ("Bayard") in civil contempt of that court's February 27, 1981 consent judgment and injunction ("consent judgment"). The finding of contempt was premised on Bayard's failure to use a source reference to distinguish a mark it had adopted in connection with the sale of certain products from the mark adopted by Sweater Bee by Banff, Ltd. ("Sweater Bee"). Despite this finding, the district court agreed with the special master that Bayard's conduct was not willful and that Sweater Bee had failed to prove any injury. As a result, the court declined to award an accounting, damages or attorney's fees against Bayard. Also adopted by the district court was the special master's recommendation that Sweater Bee pay one-third of his fees and expenses.
 
 
 2
 On appeal, Sweater Bee contends that Bayard's conduct was willful as a matter of law, that sanctions may be imposed for non-willful conduct in any event, and that the district court erred in refusing to order an accounting of Bayard's contempt revenues or profits. We hold that Sweater Bee is entitled to the benefit of sanctions for Bayard's continuous violations of the consent judgment notwithstanding the absence of a finding that the violations were willful and the absence of proof that Sweater Bee sustained any lost sales by reason of the violations, and we award an appropriate sanction.
 
 BACKGROUND
 
 3
 In May 1979, General Mills, Inc. abandoned its "Kimberly" trademark for women's apparel. Immediately thereafter, Manhattan Industries, Inc. ("Manhattan")--Bayard's corporate parent--and Sweater Bee, both of which manufacture and market women's apparel, claimed the right to use the mark. To enforce its claim, Manhattan commenced an action under section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a) (1982), in the Southern District of New York in October 1979, seeking (i) an accounting of profits derived from Sweater Bee's use of the mark, (ii) damages, (iii) costs and (iv) an injunction to prevent Sweater Bee's continued use of the Kimberly name ("1979 action").
 
 
 4
 Ruling in favor of Manhattan, the district court issued a permanent injunction against Sweater Bee but denied any monetary relief. On appeal, we reversed, finding that both parties had an equal right to use the Kimberly mark and that they could do so concurrently, provided that each party differentiated its mark from that of the other. Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd., 627 F.2d 628, 631 (2d Cir.1980). Accordingly, we remanded the matter to the district court "for the fashioning of an appropriate order...." Id. On remand, the parties entered into a consent order, which on February 27, 1981 was incorporated into a judgment, permitting each party to use the Kimberly mark on all advertising material, brochures, labels, envelopes, business cards and the like in connection with the sale, distribution and advertising of women's apparel, but only when accompanied by a "source reference" in close proximity to the Kimberly mark (e.g., "Kimberly by Sweater Bee" and "Kimberly by Bayard").
 
 
 5
 On June 26, 1981, Sweater Bee commenced an action against Manhattan ("1981 action"), claiming that in the prior trademark action Manhattan had committed fraud and perjury in procuring its concurrent right to use the Kimberly trademark and tradename, and that Manhattan repeatedly had failed to use an appropriate source reference in conjunction with the Kimberly name, in violation of the consent judgment. Later, on March 24, 1982, Sweater Bee filed an amended complaint, asserting causes of action under, inter alia, section 43(a) of the Lanham Act, the antitrust laws, federal common law and state law. On October 19, 1982, the district court granted in part and denied in part a motion by Manhattan to dismiss the amended complaint, see Fed.R.Civ.P. 12(b)(6), noting that Manhattan's failure to use a source reference "states a claim under Sec. 43(a) of the Lanham Act."
 
 
 6
 Sweater Bee moved for leave to file a second amended complaint in December 1983, to assert, among other things, additional source-reference claims and a claim against Manhattan, Bayard and certain other Manhattan-related entities and individuals for civil contempt of the consent judgment. Sweater Bee moved also for partial summary judgment on the civil contempt claim and for a judgment of criminal contempt.
 
 
 7
 After hearing oral argument, Judge Broderick on August 23, 1984 granted Sweater Bee's motion to add the additional source-reference claims, denied its motion for partial summary judgment, and held that Sweater Bee's civil contempt claim should proceed under the caption of the 1979 action so that the court could retain jurisdiction over it. He then referred the matter to a special master, who was to conduct discovery and an evidentiary hearing, report to the district court whether there had been a civil contempt of the consent judgment and, if so, determine "the amount of damages, if any, suffered by [Sweater Bee] as the result of such civil contempt." In referring the matter to the special master, the court ordered also that each side pay one-half of the master's fees, "with the ultimate responsibility for the ... fees to abide the event." Finally, the court deferred ruling on Sweater Bee's motion for a judgment of criminal contempt, which, on December 6, 1984, was dismissed upon Sweater Bee's own request.[1]
 
 
 8
 Discovery proceedings commenced toward the end of 1984. During discovery, the special master on several occasions noted Sweater Bee's failure to comply with the discovery schedule he had established. Not only was Sweater Bee regularly delinquent in producing documents and complying with the master's discovery orders, but it responded belatedly and inadequately to Manhattan's interrogatories. In fact, the special master cautioned that "appropriate actions" might be taken if Sweater Bee continued to cause delay, and observed that the number of times Sweater Bee had not met discovery deadlines "outnumber[s] the other side in a geometric fashion."
 
 
 9
 Twenty-three days of hearings, between March 14 and October 8, 1985, were held before the special master. On June 27, 1986, the special master filed his report, finding Bayard, but not Manhattan nor any of the other contempt-defendants, in civil contempt of the consent judgment. However, because he determined that Bayard's conduct was not willful and that Sweater Bee had failed to prove any injury, he declined to require an accounting of revenues or profits.
 
 
 10
 In reaching his decision, the special master reviewed various violations of the terms of the consent judgment, finding repeated omissions of the required source references in clothing labels and hang tags, sales invoices, dealings with salesmen (trade shows, sales order forms, salesmen contracts and business cards), stationary, advertising ("counter signs," co-op newspaper ads and one store catalogue), and New York lobby listings, building directories, and telephone listings. He found that the greater part of Bayard's contemptuous conduct lasted well into 1983, more than two years after the entry of the consent judgment. Further, the master determined that, by and large, Bayard's Kimberly sales invoices lacked source references until the end of July 1982, and that Bayard's New York telephone listing for its Kimberly line and showroom appeared without the required reference until sometime after January 1984, when Bayard finally advised New York Telephone to change the listing.
 
 
 11
 Equally as important, the special master concluded that Bayard failed to develop and implement a "thorough, considered ... plan of attack on compliance" with the consent judgment "that would have prevented the problems that occurred." Although Bayard--principally through Robert Hamel, Executive Vice-President, who was responsible for ensuring compliance with the judgment--instructed its employees and suppliers to use the source reference in connection with all goods sold under the Kimberly name, the master noted that there "appear[s] to have been little follow-through once initial instructions ... had been given."
 
 
 12
 Despite finding widespread contemptuous conduct, the special master concluded that Bayard's conduct was not willful. For instance, the master found that although 13,000 "Kimberly Sport" labels without a source reference were missing from Bayard's inventory and presumably added to Bayard garments, they probably were taken and sewn onto the garments "mistakenly." He found also that while the number of garments shipped with improper labels after August 1982 was "probably substantial," there was no "intentional, deliberate effort by Bayard to ship garments with the wrong labels or tags." As well, he found that even though Bayard retained and continued to use its old sales invoices and hang tags (i.e., those that lacked appropriate source references) after entry of the consent judgment in order to save money, it had ordered a "by Bayard" rubber stamp, which it received on February 26, 1981, to mark the old tags and invoices until new ones could be purchased; although the "rubber stamping" policy "was not effectively implemented or supervised," Bayard began using (with only five exceptions) "properly referenced invoices" in August of 1982.
 
 
 13
 Additionally, the master determined that there was no evidence that any actual or potential customers of Sweater Bee were or would be confused or deceived by Bayard's misconduct, particularly because of the sophistication of the customers. He found also that there was "no evidence as to the level of goodwill [Sweater Bee] may have established relating to its Kimberly line or that it experienced any loss of good will [sic] ... due to Bayard's ... conduct." He therefore determined that "there is insufficient basis for one to conclude that any sale by Bayard was at [Sweater Bee's] expense."
 
 
 14
 Consequently, the special master concluded that Sweater Bee had not shown any loss of sales or profits or, for that matter, any other type of pecuniary harm. Absent such proof of injury, the master stated that he could make no award. Moreover, the master concluded that Sweater Bee had failed to satisfy any of the standards necessary to compel an accounting: Sweater Bee failed to prove that it sustained any injury, that Bayard was unjustly enriched or that an accounting was necessary to deter Bayard from violating the consent judgment again.
 
 
 15
 Pointing to the dilatory behavior of Sweater Bee's counsel throughout discovery, the special master imposed upon Sweater Bee the obligation of paying approximately $30,000, one-third of his expenses and fees, despite having found Bayard in contempt. Finally, in light of his finding that Bayard's conduct had not been willful, the master recommended that attorney's fees not be awarded.
 
 
 16
 On July 14, 1988, more than two years after the master submitted his report, the district court summarily approved and adopted the special master's report in its entirety. Judgment was entered on August 17, 1988. This appeal timely ensued.
 
 DISCUSSION
 
 17
 1. Civil Contempt Sanctions & Attorney's Fees
 
 
 18
 Having found "clear and convincing" proof of violation of the court's 1981 consent judgment, see, e.g., Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc., 341 F.2d 101, 102 (2d Cir.1965) (per curiam), the special master recommended, and rightfully so, that Bayard be held in civil contempt. Not only did Bayard engage in sustained and material violations of the consent judgment for prolonged periods of time, but, as the master recognized, it failed to ensure proper and effective compliance with the terms of that judgment. Bayard simply was not "reasonably diligent and energetic in attempting to accomplish what was ordered," EEOC v. Local 638, 753 F.2d 1172, 1178 (2d Cir.1985) (quoting Powell v. Ward, 643 F.2d 924, 931 (2d Cir.), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981)), aff'd, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).
 
 
 19
 Given the substantial violations and Bayard's failure "to energetically police compliance" with the consent judgment, 1 J. Gilson, Trademark Protection and Practice Sec. 8.07, at 8-169 (1988), we think that contempt sanctions are particularly appropriate here, and that the special master and the district court erred in concluding that no relief was warranted. That Bayard's conduct may not have been willful does not preclude such an award, since "sanctions for civil contempt can be imposed without a finding of wilfulness," Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd., 869 F.2d 34, 39 (2d Cir.1989); see McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949).
 
 
 20
 It is well settled, however, that civil contempt proceedings must be "remedial and compensatory, and not punitive," Sunbeam Corp. v. Golden Rule Appliance Co., 252 F.2d 467, 469 (2d Cir.1958) (citing United States v. United Mine Workers, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947)), and any award resulting from such a proceeding should be "for the benefit of the complainant," Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911); accord Hicks v. Feiock, 485 U.S. 624, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988) (where the relief provided in a contempt proceeding is a fine, "it is remedial when it is paid to the complainant"). Bayard argues that sanctions are inappropriate here because Sweater Bee has not demonstrated any injury, and that, consequently, an award of profits necessarily would be punitive.
 
 
 21
 Monetary sanctions for civil contempt traditionally have been awarded to compensate the plaintiff for injury caused by past noncompliance or to prevent continued disobedience. Perfect Fit Indus., Inc. v. Acme Quilting Co., 673 F.2d 53, 56-57 (2d Cir.), cert. denied, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982); Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir.1979). When awarded as a means of compensation, however, a civil contempt fine is not always dependent on a demonstration of "actual pecuniary loss." Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 455-56, 52 S.Ct. 238, 241-42, 76 L.Ed. 389 (1932) (civil contempt proceeding for violation of injunction in patent infringement suit).
 
 
 22
 In Leman, the Supreme Court explicitly rejected a position identical to that embraced by Bayard in holding that "the concept of compensatory relief" includes profits derived by the contemnor from violation of a court order, id. at 455-57, 52 S.Ct. at 241-42; see United States v. Aberbach, 165 F.2d 713, 715 (2d Cir.1948); John B. Stetson Co. v. Stephen L. Stetson Co., 133 F.2d 129, 130 (2d Cir.1943) (per curiam). Such profits are "an equivalent or a substitute for legal damages," when damages have not been shown, and are recoverable "not by way of punishment but to insure full compensation to the party injured." Leman, 284 U.S. at 456, 52 S.Ct. at 241; accord Sunbeam, 252 F.2d at 470; id. at 471 (Hand, J., concurring); see Connolly v. J.T. Ventures, 851 F.2d 930, 932-34 (7th Cir.1988); see also Oral-B Laboratories, Inc. v. Mi-Lor Corp., 810 F.2d 20, 25-26 (2d Cir.1987) (award of profits permitted on sales made in contempt of preliminary injunction to deter future infringement). Moreover, as this type of award "goes no further than to give to the plaintiff the profits derived by the defendant's wrongful conduct: it does not take from the defendant assets not related to its wrongful conduct," Sunbeam, 252 F.2d at 470; see Connolly, 851 F.2d at 934, it is not punitive, Sunbeam, 252 F.2d at 470.[2]
 
 
 23
 Contempt sanctions are to be imposed "once the plaintiff has proved that he has suffered harm because of a violation of the terms of an injunction," Vuitton et Fils S.A., 592 F.2d at 130, but, under a theory of unjust enrichment, a contempt plaintiff is entitled to defendant's profits without submitting direct proof of injury, much less proof that any such injury "approximated in amount the defendant's profits," Monsanto Chem. Co. v. Perfect Fit Products Mfg. Co., 349 F.2d 389, 395 (2d Cir.1965), cert. denied, 383 U.S. 942, 86 S.Ct. 1198, 16 L.Ed.2d 206 (1966); cf. Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 121-24 (9th Cir.) (unjust enrichment theory of recovery effectuates policies of Lanham Act), cert. denied, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968). This is because an award based on the defendant's profits, resting upon principles of unjust enrichment, focuses on the defendant's wrongdoing, not on damage to the plaintiff. See Blue Bell Co. v. Frontier Refining Co., 213 F.2d 354, 363 (10th Cir.1954) (in trademark infringement case, profits award "predicated upon the equitable principle of unjust enrichment, not the legal theory of provable damages").
 
 
 24
 The special master apparently concluded that Sweater Bee did not prove direct injury (which is not to say that no injury existed), that Bayard was not unjustly enriched and, therefore, that Sweater Bee was not entitled to any profits earned by Bayard from sales made in violation of the consent judgment. Based on the record before us, however, "it seems obvious that there must have been some economic injury to [Sweater Bee]," such as the loss of goodwill, Monsanto Chem. Co., 349 F.2d at 396. The master did not find to the contrary. He merely found that Sweater Bee had not demonstrated any economic injury.
 
 
 25
 As to his conclusion regarding unjust enrichment, the special master apparently assumed that both Bayard and Sweater Bee had a concurrent right to use the unmodified Kimberly mark, and that, consequently, Bayard had a right to reap profits from its Kimberly sales. We think that the special master began his analysis with a faulty premise. Neither party possessed the right to use the Kimberly mark standing alone. Instead, each party was permitted to sell Kimberly merchandise only when the Kimberly name was accompanied by a source reference. Thus, Bayard had the right to sell not "Kimberly" goods, but "Kimberly by Bayard" goods. Under this approach, all of Bayard's profits derived from goods sold without the requisite source reference were unjustly earned.
 
 
 26
 Accordingly, we hold that Sweater Bee is entitled to those profits derived by Bayard from the unlawful sales of Bayard's Kimberly merchandise--namely, the profits from sales made between February 27, 1981 and January 10, 1984, the period in which Bayard was in civil contempt of the district court's consent judgment. Of course, by "profits" we mean net profits, see Murphy Door Bed Co. v. Interior Sleep Systems, Inc., 874 F.2d 95, 103 (2d Cir.1989); W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 665 (2d Cir.1970), and note that the burden is on the contemnor "to prove any deductions for its costs from the gross revenues attributable to its contempt," Oral-B, 810 F.2d at 26; cf. Sheldon v. Metro-Goldwyn Pictures Corp., 106 F.2d 45, 54 (2d Cir.1939) (overhead that does not assist in production of infringing item "should not be credited to the infringer; that which does, should be"), aff'd, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940).
 
 
 27
 Before determining an appropriate award based on those profits, however, we pause to comment on the propriety of calculating profits at the appellate level. Though such matters ordinarily are best left to a trial court, we may determine Bayard's unlawful Kimberly net profits here because the record already contains all the evidence necessary to do so. See Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 516 F.2d 172, 186 & n. 16 (2d Cir.1975), rev'd on other grounds, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Such evidence was submitted to the special master, who was charged with responsibility of computing damages in the event that he found Bayard in contempt. This case already has been protracted unduly, and "[w]e have no doubt that, given the tenacity of both sides, a remand would result in still another appeal...." Id. at 186. While "in certain types of cases the failure of the trial court to make necessary findings of fact on the issue of [calculating profits] requires a remand for such findings," id. at 186 n. 16, we need not remand this matter since "the critical evidence is largely documentary" and the testimony of the experts essentially tracks the written evidence, id.; see Barnes v. Santacroce, 815 F.2d 888, 889 (2d Cir.1987) (per curiam); Mallis v. Bankers Trust Co., 717 F.2d 683, 697-99 & n. 2 (2d Cir.1983) (Newman, J., concurring).
 
 
 28
 We start, then, for purposes of this case, with Bayard's gross sales in its Kimberly line for the relevant period less discounts; both Sweater Bee and Bayard agree that this amount comes to $2,165,074. From these sales, Bayard bears the burden of demonstrating deductions for costs and expenses: It must prove not only that it has borne the particular cost or expense but also that the cost or expense is attributable to its unlawful sales. See Oral-B, 810 F.2d at 26; W.E. Bassett, 435 F.2d at 665; cf. Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966 at 973 (2d Cir.1985). Bayard has sustained its burden as to the costs of goods sold, and the gross profit remaining after that deduction is $786,298.
 
 
 29
 Next, we consider various enumerated expenses for which Bayard may be entitled to a deduction. As to the sales commissions, returns, samples and markdowns, shipping costs, interest on money borrowed from its corporate parent, and taxes that it claims, we find sufficient support in the record to conclude that Bayard has sustained its burden, see Kamar Int'l, Inc. v. Russ Berrie & Co., 752 F.2d 1326, 1332-33 (9th Cir.1984) (expenses deductible where the contemnor can adequately demonstrate that they "actually contributed to the production, distribution or sales of the [unlawful] goods"). Bayard there is entitled to a deduction for these enumerated expenses in the amount of $619,341.
 
 
 30
 Bayard also seeks to deduct selling expenses, or overhead, totalling $281,730 for the three year period. We are not convinced, however, that Bayard is entitled to the entire deduction claimed for this item. Although Bayard need not prove its overhead expenses and their relationship to the production of the contemptuous goods in "minute detail," Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 516 (9th Cir.1985) (citing Sheldon, 106 F.2d at 52), it still must carry its burden of demonstrating a sufficient nexus between each expense claimed and the sales of the unlawful goods. The rationale for this rule is obvious: Because Bayard manufactured the goods that were found to have violated the consent judgment and presumably maintains records of its sales and production, Bayard, and not Sweater Bee, is obliged to produce satisfactory records of, and demonstrate with sufficient particularity, its Kimberly overhead. Bayard, however, has offered grossly inadequate evidence of its Kimberly overhead; the record contains only data pertaining to Bayard's overall selling expenses. For example, Bayard's detailed schedules of fixed expenses for the relevant three year period do not indicate whether and to what extent Bayard's expenses are attributable to its Kimberly production.
 
 
 31
 Bayard attempts to compensate for this evidentiary shortcoming by estimating its Kimberly overhead as 9.5% of its Kimberly net sales for the 1981 fiscal year, 12.8% for the 1982 fiscal year, and 22.9% for the 1983 fiscal year. These percentages apparently are derived by dividing Bayard's total overhead by its total net sales for all its lines, including Kimberly. There is some support for the proposition that a party may approximate overhead in the absence of reliable data pertaining to actual overhead. See Frank Music, 772 F.2d at 516; Kamar, 752 F.2d at 1333. Bayard, however, has not adequately demonstrated that reliable data are unavailable. Estimates should not be used unless such a showing has been made. See Wilkie v. Santly Bros., 139 F.2d 264, 265 (2d Cir.1943) (in apportioning overhead, there are no "hard and fast" rules; profits, however, "must be determined as fairly and as accurately as the circumstances of the case will permit"), cert. denied, 322 U.S. 740, 64 S.Ct. 1058, 88 L.Ed. 1574 (1944). Accordingly, based on the record before us, see Chris-Craft, 516 F.2d at 186 & n. 16, we hold that Bayard is not entitled to the overhead expenses deduction that it claims. Nevertheless, because Sweater Bee concedes that Bayard is entitled to a deduction for this category of expenses of $19,758, clearly a reasonable figure, see W.E. Bassett, 435 F.2d at 665, we deduct that amount.
 
 
 32
 After making the necessary calculations, we conclude that Sweater Bee is entitled to an award representing Bayard's unlawful Kimberly net profits in the amount of $147,199, plus interest calculated as of August 17, 1988, the date of the district court's judgment. See 28 U.S.C. Sec. 1961(a) (1982); Fed.R.App.P. 37. Since the net profits are shown sufficiently in the record, no further accounting is necessary.
 
 
 33
 As to attorney's fees, courts in this Circuit generally "award the reasonable costs of prosecuting the contempt, including attorney's fees," only where violation of a court order is found to have been willful. Canterbury Belts, 869 F.2d at 39 (quoting Vuitton et Fils S.A., 592 F.2d at 130); W.E. Bassett, 435 F.2d at 664-65 & n. 5; accord Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967). While Bayard's course of conduct over a period of years may have "demonstrated a callous disregard for the rights of [Sweater Bee] and for the mandates of the federal courts," W.E. Bassett, 435 F.2d at 664, the special master and the district court determined that Bayard did not willfully violate the consent judgment. We see no reason to disturb that finding, and therefore decline to award attorney's fees.
 
 2. The Special Master's Fees & Expenses
 
 34
 The special master, in imposing on Sweater Bee one-third of his fees and expenses, took into account the "numerous failures" of Sweater Bee's counsel "to meet discovery deadlines" as well as counsel's "conduct throughout the proceedings." The special master also recognized Manhattan-Bayard's responsibility for some delay in the proceedings, and concluded: "Bayard should be held responsible for its own conduct, but it should not suffer prejudice because of [Sweater Bee's] counsel's conduct. Nevertheless, the overriding fact is that it was Bayard's failures that brought us here in the first place."Certainly the special master was in the best position to judge the nature of both parties' conduct and to apportion his fees and expenses accordingly. We cannot say, therefore, that the district court abused its discretion in approving the apportionment. See Apponi v. Sunshine Biscuits, Inc., 809 F.2d 1210, 1220 (6th Cir.), cert. denied, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987); Morgan v. Kerrigan, 530 F.2d 401, 427 (1st Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976).
 
 3. Costs & Sanctions on Appeal
 
 35
 On appeal, Bayard requests (1) an award of costs, including attorney's fees, for having to defend in this Court the district court's assessment of costs against Sweater Bee; (2) sanctions pursuant to Fed.R.App.P. 38 for Sweater Bee's prosecution of a frivolous appeal regarding the allocation of the special master's fees; and (3) sanctions pursuant to section 38 of the Rules of the Second Circuit because of Sweater Bee's dilatory and improper conduct on this appeal (e.g., four extensions of time to file its brief; motion to file an oversize brief (244 pages) made nine days after the brief was filed; joint appendix filed three weeks late).
 
 
 36
 We decline to award any such costs or sanctions. Appealing the assessment of the master's fees and expenses hardly was frivolous; Sweater Bee prevailed below on the contempt issue and the district court had ordered that the "ultimate responsibility" for the master's fees was to abide the event. Likewise, given the discretionary nature of Second Circuit Rule Sec. 38, Sweater Bee's conduct was neither "grossly delinquent," as Bayard would have us believe, nor sufficiently remiss so as to warrant the imposition of sanctions under that Rule.
 
 CONCLUSION
 
 37
 The judgment of the district court is reversed to the extent that it declined to award contempt sanctions and the matter is remanded for entry of a judgment in the amount of $147,199, plus interest from August 17, 1988. The judgment is affirmed to the extent that it denied Sweater Bee its attorney's fees and imposed upon Sweater Bee the obligation of paying one-third of the special master's fees and expenses. Bayard's request for costs and sanctions on appeal is denied. In light of our disposition today, we trust that Sweater Bee will withdraw with prejudice its claims in the 1981 action, as it has indicated it would.
 
 
 
 [1]
 On November 9, 1984, the Kimberly controversy came before our Court for the second time, but this time in connection with the 1981 action. Sweater Bee By Banff, Ltd. v. Manhattan Indus., Inc., 754 F.2d 457, 460 (2d Cir.), cert. denied, 474 U.S. 819, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985). As the consent judgment provided for arbitration of "[a]ll disputes under or arising out of this judgment," id. at 459 (quoting consent judgment), Manhattan had moved for arbitration of the source-reference claims and a stay of the proceedings pending arbitration. The district court granted the motion in part, and Sweater Bee appealed. On appeal, we were presented only with the issues whether Manhattan had waived its right to arbitration and "whether the exercise of pendent appellate jurisdiction is appropriate in connection with the denial of Sweater Bee's motion to add civil contempt to the tort theories under which the source-reference allegations were being litigated, the denial of its motion for partial summary judgment as to liability for civil contempt, and the reference of the civil contempt claim to a master." Id. at 460. On February 6, 1985, noting the "neverending supply of arrows from [Sweater Bee's] quiver," id. at 465, we held that arbitration had not been waived and declined to exercise pendent appellate jurisdiction over the nonappealable portions of the district court's August 23, 1984 order
 
 
 [2]
 Even though Bayard may have "discontinued" its business and "terminated" all its employees, and Manhattan indicates that it has not used the Kimberly trademark "for several years," we are persuaded that civil relief is warranted here not merely to compensate Sweater Bee, but to ensure compliance with the consent judgment in the future. See Oral-B, 810 F.2d at 25. That such relief will have the added effect of vindicating the court's authority in no way suggests that sanctions awarded to Sweater Bee are punitive and not remedial. See Hicks, 108 S.Ct. at 1431 ("both civil and criminal [contempt] relief have aspects that can be seen as either remedial or punitive or both")