**PROJECT STRATEGIES CORP., Plaintiff,**

v.

**NATIONAL COMMUNICATIONS CORP., et al., Defendants.**

**No. CV–94–4925.**

United States District Court, E.D. New York.

Dec. 19, 1996.

Charles Kennedy, Lerner David Littenberg Krumholz & Mentlik, Westfield, NJ, Robert D. Piliero, Piliero Goldstein Jenkins & Hall, New York City, for plaintiff.

Michael B. Golden, Rosner, Bresler, Goodman & Golden, New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

This case has been before the court on several occasions as will hereafter be detailed and on this last occasion was tried to the

court, without a jury, and on which the plaintiff sought a permanent injunction; damages for claimed violations of § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and for contempt, findings on which have previously been made. The defendants allege and seek damages for patent mismarking pursuant to 35 U.S.C. § 292(a) and in addition, claims that the alleged mismarking renders the plaintiff's hands unclean and is a defense to the plaintiff's claims for relief.

By way of brief background the plaintiff ("PSC") and the defendants ("NCC" collectively) sell gloves designed with teat-like protrusions on the palm surface for brushing a pet's hair. PSC marketed the product by a nationwide direct sales campaign which included television and print advertising and store displays. NCC subsequently undertook to market a similar pet glove trumpeting it as the pet glove "As Seen on TV."

On October 21, 1994 PSC sought to enjoin NCC from representing its product as one "As Seen on TV," relying upon § 43(a) of the Lanham Act. Following expedited discovery and a hearing on October 28, 1994, a temporary restraining order ("T.R.O.") was issued enjoining NCC from thus continuing to represent its product. That order was extended indefinitely upon consent of the parties on November 22, 1994.

Notwithstanding that restraining order, NCC advertised its product in a television commercial in December, 1994 with the "As Seen on TV" legend displayed on its product package. PSC moved for an order holding NCC in contempt which was granted on June 13, 1995 with the determination of appropriate sanctions to be decided at a later date.

NCC thereafter moved pursuant to Rule 60(b) of the Federal Rules of Civil Procedure to vacate the restraining order basing its claim for that relief upon the expenditure of $275,000 on television advertising through June 21, 1995. In a Memorandum and Order dated October 27, 1995, familiarity with which is presumed, NCC's motion was denied and the case was set down for trial.

The issues to be tried, as identified by the plaintiff, are: (1) its entitlement to a permanent injunction; (2) the damages to which it is entitled pursuant to § 43(a) of the Lanham Act and by virtue of the court's finding that the defendant was in contempt for violating the T.R.O. issued by the court. The issues, as identified by the defendants, are: (1) the standing of the plaintiff to maintain the action; (2) the plaintiff's unclean hands attributable to a claim of patent mismarking; (3) the wilfulness of the defendants as affecting damages. At the conclusion of the trial, the court makes the following findings of fact and conclusions of law.

■ The evidence presented during the course of this bench trial focused primarily on the issue of damages and on the defendants' claim of patent mismarking and unclean hands. Very little evidence was adduced pertaining to the plaintiff's claim of entitlement to a permanent injunction. The reason for that is surely explained by the prior determinations made by this court in granting the T.R.O. and in denying the defendants' application to vacate it. In the Memorandum and Order dated October 27, 1995, the court held that the plaintiff developed the market for the "Purebred Pet Mitt," conducted a national promotional campaign of television commercials, print advertising and point of purchase displays. Through October 27, 1995, the court found that PSC spent approximately $3 million dollars in advertising and its packaging sought to capitalize on its extensive advertising by featuring on it the legend "As Seen on TV." The court also found that the defendants began marketing a similar product it called the "Miracle Pet Brush" and included the legend "As Seen on TV" on its packaging. The court found that NCC was misrepresenting its product as the one seen on TV when it had not, in fact, so advertised it. By so doing, the court found that PSC was exposed to irreparable harm, that it had a likelihood of success on the merits and was entitled to the issuance of a T.R.O. enjoining NCC from advertising its product using the phrase "As Seen on TV" or from making other representations which were similarly misleading. The findings made then as justification for the issuance of the T.R.O. order remain undisturbed. The consent of the parties extending the operative effect of the T.R.O. indefinitely, transformed that order for all

intents and purposes into a preliminary injunction. The evidence received during the course of the proceedings culminating in the bench trial required no repetition upon trial and are deemed part of the trial record. *See* Rule 65(a)(2), Federal Rules of Civil Procedure. For the reasons stated and the facts found upon which the T.R.O. was issued, that order is now made permanent and NCC is hereby permanently enjoined from advertising its product using the legend "As Seen on TV" or from making other representations concerning its product which would be similarly misleading and calculated to deceive consumers as to any relationship between its product and the plaintiff's.

### *Damages*

The parties stipulated that the defendants realized gross sales in the amount of $370,144, resulting from their advertising which the court found was contemptuous in that it was in flagrant violation of its previously issued T.R.O. (Stip. Facts 17). The defendants undertook to establish their cost of the goods then sold and the costs they incurred in advertising those goods on television. That undertaking depended for its success upon two principal exhibits which were received in evidence as DX–G and DX–H which were the subjects of extended colloquy. DX–G purportedly reflected a schedule of advertising of the defendants' Miracle Pet Brush. DX–H purportedly reflected a summary of advertising costs. The summaries were received in evidence but not as proof of the fact that the payments had actually been made (Tr. 175) without production of the documents, viz., canceled checks, which would be the relevant and probative documents upon which the summary was bottomed, Fed.R.Ev. 1006; (Tr. 179, 190–91). Mark Kravits, the Vice–President for Advertising of NCC and America Direct Marketing, testified that all the checks representing payment for advertising purchased were turned over to the plaintiff. (Tr. 190). In addition, the plaintiff introduced into evidence, PX–50, checks that were delivered to the plaintiff during discovery. None of the checks included in that exhibit were canceled. (Tr. 200). Mr. Kravits testified that if payment had in fact been made for an advertising expense it would be substantiated by a canceled check. (Tr. 199). Although all documents relating in any way to the advertising of the pet gloves sold by defendants were requested for production (PX–47, request 12), no canceled checks were produced. The uncancelled checks introduced by the plaintiff PX–50 are not probative of payment for that reason, but they are also not probative for the additional reason that it was not established what, if any, portion of those checks would have represented payment for the gloves in issue and what portion would have been in payment for the advertising of other goods. In this regard, Mr. Kravits testified that the defendants would have to pay in advance for TV commercials and the check in payment to the station would include payment for different time slots and different products. (Tr. 187).

On June 13, 1995, following a hearing, the defendants were found to be in contempt of the T.R.O. previously issued by the court. (Pretrial Order, Stip. Facts 14). *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1 (2d Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990) is instructive on the sanction consequences attendant upon such a finding. To begin, the sanction should be remedial and compensatory, and not punitive. Such sanctions are awarded to compensate the complainant for the injury to which disregard of the court's order gave rise and also to provide some assurance that future disobedience of the court's order will be discontinued. Particularly pertinent for the precise issue before us is the teaching that:

> Contempt sanctions are to be imposed "once the plaintiff has proved that he has suffered harm because of a violation of the terms of an injunction," ... but, under a theory of unjust enrichment, a contempt plaintiff is entitled to defendant's profits without submitting direct proof of injury, much less proof that any such injury "approximated in amount the defendant's profits," .... This is because an award based on the defendant's profits, resting upon principles of unjust enrichment, focuses on the defendant's wrongdoing, not

on damage to the plaintiff. (Internal references omitted).

885 F.2d at 6.

The court then went on to explain that "profits" is intended to mean net profits and that the burden of proof is upon the defendant-contemnor "to prove any deductions for its costs from the gross revenues attributable to its contempt." 885 F.2d at 7.

The failure of the defendants to carry that burden by providing any reliable evidence of the deductions from gross revenues to which it would be entitled prompts the invocation of a corollary to the "ancient doctrine that when a party frustrates proof of damages, either by withholding facts or through inaccurate record-keeping, any doubts about the actual assessment of damages will be resolved against that party, and the fact-finder may calculate damages at the highest reasonably ascertainable value." *Chesa Int'l, Ltd. v. Fashion Associates, Inc.*, 425 F.Supp. 234 (S.D.N.Y.), *aff'd mem.*, 573 F.2d 1288 (2d Cir.1977). The fidelity with which that doctrine has been applied may be traced back nearly 275 years to *Armory v. Delamine*, 1 Strange [K.B.] 505, 93 Eng.Rep. 664 (1722) in which a small boy, a chimney sweep, found a jewel which he brought to the defendant's goldsmith shop for an appraisal. Under the pretense of weighing the jewel, an apprentice removed the stones and informed his master that the jewel was worth three halfpence which was offered to the boy. The little chimney sweep refused to take it, and demanded its return. The apprentice returned the socket without the stones and a suit in common law trover (better known as conversion) followed. As to the value of the jewel, experts testified what a jewel of the finest water that would fit the socket would be worth and the Chief Justice directed the jury that unless the defendant produced the jewel and showed it not to be of the finest water, they should presume the strongest against him and make the value of the best jewels the measure of their damages, which they did. *See also Gaste v. Kaiserman*, 863 F.2d 1061, 1069–70 (2d Cir.1988); *Shapiro, Bernstein & Co., Inc. v. Remington Records, Inc.*, 265 F.2d 263, 271–72 (2d Cir.1959) (Burger, J. sitting by designation).

These defendants stand in the shoes of the goldsmith. Unless the defendants produce reliable evidence of deductions to which they would be entitled, we should presume the strongest against them. Reliable evidence in the form of canceled checks was produced establishing the cost of the goods sold as being $28,350. (DX–L; Tr. 203–06). Accordingly, the plaintiff is entitled to recover the sum of $341,794 representing the difference between gross sales of $370,144 and the cost of the goods sold pursuant to 15 U.S.C. § 1117(a).

■ The plaintiff urges the award of treble that amount based upon bad faith of the defendants and their wilful violations of the court's orders. The findings of contempt that have been made, standing alone, establish the wilfulness of the violations of the court's orders. A finding of bad faith would be compelled by a reading of the testimony of Herman Howard, the president and sole shareholder of the corporate defendants and of Mark Kravits. That testimony reflects either an indifference to the significance of the proceedings or an indifference to the solemnity of an oath, or both. Suffice it to say that credibility was not a hallmark of their testimony. The salient portion of § 1117(a) upon which the plaintiff bases its claim for enhanced damages, reads as follows:

The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court *may* enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award

reasonable attorney fees to the prevailing party. (Emphasis added).

There is thus a congruence between *Manhattan Industries, supra,* and § 1117(a) in that each makes it plain that damages, whether attributable to civil contempt or to a violation of § 43(a) of the Lanham Act, codified in Title 15 of the United States Code, shall be compensatory and not punitive. Recognizing that § 1117(a) makes provision for entering a judgment for enhanced damages, the statute vests that power in the court's discretion to be exercised upon a finding that "the amount of recovery based on profits is ... inadequate." I do not make that finding and therefore deny the plaintiff's request for enhancing the damages by a multiple of three.

■ The plaintiff's request for attorney fees, however, stands on a different footing. The touchstone guiding the court's determination of that issue is the last sentence of § 1117(a), namely, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." What then, are deemed to be "exceptional cases?" In *Vuitton Et Fils, S.A. v. Crown Handbags,* 492 F.Supp. 1071 (S.D.N.Y.1979), *aff'd,* 622 F.2d 577 (2d Cir.1980), the court quoted the Department of Commerce statement accompanying the Senate report on the amendment of § 1117(a) to provide for an award of attorney fees as follows:

> Trademark and unfair competition case brought under the Trademark Act of 1946 ... present a particularly compelling need for attorney's fees ... Deliberate and flagrant infringement of trademarks should particularly be discouraged in view of the public interest in the integrity of marks as a measure of quality of products. Effective enforcement of trademark rights is left to the trademark owners and they should, in the interest of preventing purchaser confusion, be encouraged to enforce trademark rights. It would be unconscionable not to provide a complete relief including attorney's fees.

The court continued:

> The Senate Committee added that the "Department of Commerce believes and the Committee agrees that *the remedy should be available in exceptional cases i.e., in infringement cases where the acts of infringement can be characterized as, 'malicious,' 'fraudulent,' 'deliberate' or 'willful.'"* Sen.Rep. No. 93–1400, 93rd Cong., 2d Sess. (1974) reprinted in (1974) U.S.Code Cong. and Admin.News pp. 7132, 7133, 7135. (Emphasis added).

492 F.Supp. at 1078.

The cases have consistently applied the "malicious," "fraudulent," "deliberate" or "willful" prerequisites to the award of attorney fees. *See, e.g., Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 850 F.Supp. 232, 253 (S.D.N.Y.1994); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 652 F.Supp. 1105, 1114 (S.D.N.Y.), *aff'd,* 830 F.2d 1217 (2d Cir.1987). I can think of no clearer indicator of conduct that is deliberate and wilful than a finding of civil contempt. The evidence adduced at trial simply buttresses that finding. Mr. Howard testified that he knew that a T.R.O. forbade his companies from representing this product as having been advertised on T.V. (Tr. 108). The following colloquy is indicative of the cavalier response to the T.R.O. On direct examination of Mr. Howard he was asked, at Tr. 109–10:

Q. Did you receive a copy of the Temporary Restraining Order?

A. I saw a copy.

Q. Did you keep a copy?

A. I would imagine there is one in the office. I left word, that's it. It's a small deal, forget it, its over.

\* \* \* \* \* \*

Q. What I'm asking you, isn't it a fact when the order came down you implemented no procedure to insure for future advertising it would comply with the Temporary Restraining Order?

A. Wrong, I told Mr. Kravits, that's the end of it. Stop it until we get a ruling from the Judge that we can do it.

Q. Did you implement a review procedure?

A. What is there to review?

Q. Did you implement a review procedure?

A. I did not.

Mr. Kravits testified that he had no recollection of ever receiving or seeing a copy of the T.R.O., although he did acknowledge that he was present in court when the order was issued restraining the defendants from the use of "As Seen on TV" or TV references in any advertising that he did for the defendants' product. (Tr. 130–31). In that regard, the following testimony was elicited from Mr. Kravits on his direct examination:

Q. And you, in fact, created a sell sheet, Plaintiff's Exhibit 51, that had representation on it that are directly contrary to the Temporary Restraining Order in this case, isn't that correct, sir?

\*    \*    \*    \*    \*    \*

A. I prepared it.

Q. Did you answer my question?

A. I prepared it.

Q. And you understood or you understand that it has representations in there that are directly in violation of the Court's Temporary Restraining Order?

\*    \*    \*    \*    \*    \*

A. I understand it's a document that I cannot disseminate, yes.

\*    \*    \*    \*    \*    \*

Q. Mr. Kravits, you understood at the time that you prepared Plaintiff's Exhibit 51 that it contained representations that were in direct violation of the Court's Temporary Restraining Order?

A. Yes, that is correct.

Tr. 132–34.

Television advertisements procured by the defendants also violated the Temporary Restraining Order and were the subject of a finding of contempt on June 13, 1995.

The prerequisites of wilfulness and deliberateness have been established and provide ample justification for awarding attorney fees to the plaintiff.

■ The plaintiff urges that a judgment be entered in this case against the corporate defendants and Herman Howard jointly and severally. The controlling principle in this regard is stated in *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913 (E.D.N.Y.1988) in these terms:

> While a corporate officer is not necessarily individually liable for torts committed on behalf of the corporation, personal liability for trademark infringement and unfair competition is established "if the officer is a 'moving, active conscious force behind [the defendant corporation's] infringement.'" (Citation omitted).

*See also Grupke v. Linda Lori Sportswear, Inc.*, 921 F.Supp. 987, 999 (E.D.N.Y.1996), *reconsideration granted in part by* 1996 WL 525284 (E.D.N.Y. Sept. 3, 1996).

The facts which would determine whether that principle is applicable are found to be as follows: Mr. Howard is the only officer and sole shareholder of National Communications Corp. He exercises complete control over that company and makes all significant decisions regarding its operation. As sole shareholder, he also enjoys all profits made by the company. (Tr. 97). Mr. Howard is also the sole owner and only officer of America Direct Marketing which he characterized as a "fulfillment center" from which orders are shipped. He is also the sole owner and only officer of Media Group, Inc. (Tr. 100). Mr. Howard directed Mr. Kravits to proceed with the marketing of the pet gloves after he had seen a TV advertisement of the plaintiff's product. (Tr. 103–09; 119–20). The facts awaken the principle and lead to the conclusion that Mr. Howard is liable jointly and severally for the plaintiff's damages.

■ The defendants contended that the plaintiff lacked standing to bring this action. They based that contention upon portions of the agreement which gave the plaintiff a license to market the Purebred Mitt. That license agreement provided that subject to the rights granted the plaintiff, the licensor retains all right, title and interest in and to the trademark. The licensor retains the right, but not the obligation, to enforce its rights in the trademark against infringement and if it declines to exercise its right after being requested to, the licensee shall have that right of enforcement in the licensor's name.

That contention is fundamentally flawed. It raises the defense of *jus tertii*, that is, the right of a third party that is superior to the right of the plaintiff and therefore is the proper party to bring the suit. That defense was discussed at some length in *Bambu Sales*, 683 F.Supp. at 909–10, and rejected. The court, after citing relevant judicial authority on the point then quoted from 2 J. McCarthy, *Trademarks and Unfair Competition*, at 674–75 as follows:

As a matter of policy, *jus tertii* should not be allowed as a defense in any trademark case. So long as plaintiff proves rights superior to defendant, that is enough. Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world....

To permit a *jus tertii* defense would be an unwise judicial policy because it would expand many trademark disputes far beyond a mere two party conflict.... By raising *jus tertii*, a defendant could effectively divert attention from its own alleged infringement and become a vicarious avenger of another's purported rights against itself. A case could be expanded beyond reasonable bounds and effectively slowed to a crawl.

*See also* Tr. 161–64.

The defendants urge that the injunctive relief and all other relief to which the plaintiff may otherwise be entitled under the Lanham Act should be denied because the plaintiff's hands are unclean. That defense is based upon the following. On the plaintiff's packaging of its Purebred Pet Mitt sold in retail stores in the United States, it was stated: "WARNING: THE PUREBRED™ MITT IS PROTECTED WORLDWIDE BY U.S. AND FOREIGN PATENTS GRANTED AND PENDING. UNAUTHORIZED MANUFACTURE OR DISTRIBUTION IS SUBJECT TO SEVERE PENALTIES UNDER U.S. AND FOREIGN LAWS." (PX–4) Foreign patents were granted. U.S. patents were pending but not yet granted. The defendants' charge of unclean hands is that the notice should have read "U.S. AND FOREIGN PATENTS PENDING AND GRANTED." The inverted notice is thus claimed to be a violation of 35 U.S.C. § 292(a), the relevant portion of which provides:

Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public;

\* \* \* \* \* \*

shall be fined no more than $500 for every such offense.

§ 292(b) authorizes any person to sue for the penalty.

These questions are raised by the defendants' assertions: (1) Has the statute been violated at all? (2) If it has been, does it provide a defense or only a suit for the penalty? and (3) If a defense is available, is it applicable to the facts of this case?

### A. *Has the Statute Been Violated*?

The evidence established that at the time the plaintiff obtained the license to market the Purebred Pet Mitt, patents had been granted in Australia, the United Kingdom, Denmark, Austria, France, Germany, Ireland, Sweden and five other countries. Patents were pending in Canada, the United States, Italy, Spain and several other countries. (Pretrial Order, ¶ 20, PX–52). Shortly before the commencement of the trial, the plaintiff was notified that the United States patent was granted. (Tr. 62; PX–35). The testimony in this regard of Allan Ziskind, the president and chief operating officer of the plaintiff was as follows:

Q. Now, returning to the patent notice, which appears on Plaintiff's Exhibit 4—

A. Right.

Q. (Continuing)—could you tell the Court what you were intending to accomplish when you prepared that notice?

A. We used that same notice on all the gloves and on the box and the hope was to have one notice that would serve all of our purposes. So as things changed with various patent status in different countries, we wouldn't have to change any of our packaging. We wanted the one inventory for several all purposes, we do, we ship from

one point, one manufacturing point to all countries in the world.

Q. And I notice that the notice does not say specifically in which countries patents are granted and which countries patents are issued, why is that the case?

A. Because it keeps changing. I wanted to do one run—just continue to do it and not break down inventory, changing tags and labels.

Q. When you prepared the patent notice, did you intend to convey by the patent notice that you had, in fact, an issued United States patent?

A. No.

Q. Did you intend to deceive the public to believing that you had an issued U.S. patent?

\* \* \* \* \* \*

Q. Now, during the entire time for the United States patent from the date it was filed to the date that the notice of allowance came out, did you have a good faith belief that a U.S. patent would issue?

A. Yes, I did.

Tr. 62–63.

The following was elicited from Mr. Ziskind on cross examination:

Q. Now, Mr. Ziskind, the trademark—the patent legend on the box reads, "The Purebred trademark mitt is protected worldwide by U.S. and foreign patents granted and pending"?

A. I assume you just read it?

Q. Yes. That's what it says?

A. Yes.

Q. And [I] think you testified on direct the purpose was that you would have a universal legend, you wouldn't have to change every time the patent status changed, is that correct?

Correct.

Would you not have accomplished the same purpose to have drafted a legend which said, the Purebred mitt is protected worldwide by U.S. and foreign patents pending and granted?

A. I think it would have served the same purpose.

Q. Nevertheless, you choose to draft the legend so that the U.S. was first, and granted was first, isn't that correct?

A. I don't know that I gave any real attention to that sequence, this is the legend that I drafted.

Q. You testified on direct that you were responsible—that you were responsible for that language, in deposition, is that correct?

A. Yes.

(Tr. 83).

\* \* \* \* \* \*

Q. Now, let me direct your attention back to the patent legend to the back of Plaintiff's Exhibit 4.

A. The warning notice, that is what you are referring to as the patent legend? The white box?

Q. It's a warning notice, is what you said?

A. It says "warning" on it.

Q. Warning people that they could what, be subject to penalties for a patent infringing product?

A. It would say, if somebody—I would look at this notice which indicates where there was an existing patent, someone infringed, they would be subject to penalties.

Q. At the time that was put on the box, there was no existing patent in the United States, is that correct?

A. That is correct.

Q. And that box was distributed in the United States?

A. This box was distributed in the United States, correct.

Q. At the time that you caused the legend to be put on the box, you, in fact, knew there was no patent protection for that product in the United States, isn't that correct?

A. I developed this box many months before it was used. At the time that we developed the box, there was a U.S. patent pending—

(Tr. 94–95).

▮ To begin with, I fail to find that § 292(a) was violated at all. The fact is that patents were granted and pending. Whether

the word "granted" would be construed as relating to "U.S." rather than to "foreign" would be of some moment perhaps to a sophisticated grammarian but there isn't a jot or a tittle of evidence to even suggest that it would be misleading or deceiving to the average reader.

The statute was not violated for the additional reason that there wasn't a scintilla of evidence of any intent to deceive the public. *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670, 700 (S.D.N.Y.1963) (It is a prerequisite to a violation of § 292 that improperly marking an article is done with the purpose of deceiving the public); *Ansul Company v. Uniroyal*, 306 F.Supp. 541, 566 (S.D.N.Y.1969) (The statute being penal in nature must be strictly construed and therefore the demonstrated absence of any intent to deceive the public calls for dismissal of the § 292 claim), *aff'd in part rev'd in part*, 448 F.2d 872 (2d Cir.1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972). *See also Arcadia Machine & Tool, Inc. v. Sturm, Ruger & Co., Inc.*, 786 F.2d 1124, 1125 (Fed.Cir.1986) (There can be no violation of § 292 absent an evidentiary showing that the mismarking was for the purpose of deceiving the public); *Airwick Industries, Inc. v. Sterling Drug, Inc.*, 720 F.Supp. 409, 415 (D.N.J.1989); *Johnston v. Textron, Inc.*, 579 F.Supp. 783, 795 (D.R.I.), *aff'd*, 758 F.2d 666 (Fed.Cir.1984).

█ Finally, in addition to the foregoing, that a violation of § 292, even if one were established, could not be asserted as a defense to the plaintiff's claim was clearly established in *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347 (9th Cir.1963) in which it was claimed that Republic's disregard of § 292 was a basis for a finding of unclean hands in Republic's action for patent infringement and unfair competition. In rejecting that claim, the court wrote:

> [M]isconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands....
>
> What is material is not that the plaintiff's hands are dirty, but that he dirtied them in

acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant. As Professor Chafee suggests (page 1072)[1], we should not by this doctrine create a rule comparable to that by which a careless motorist would be "able to defend the subsequent personal injury suit by proving that the pedestrian had beaten his wife before leaving home."

\* \* \* \* \* \*

Unclean hands, then, does not stand as a defense that may be properly considered independent of the merits of the plaintiff's claim.... In the interests of right and justice the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public. Rather the court must weigh the substance of the right asserted by plaintiff against the transgression which, it is contended, serves to foreclose that right. The relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck. (Citations omitted). The ultimate decision is whether the deception actually caused by plaintiff "as compared with the trading methods of the defendant warrant punishment of the plaintiff rather than of the defendant."

319 F.2d at 349–50.

Where the plaintiff has not violated § 292 and is therefore not at fault, the "ultimate decision" must be precisely the decision reached by the court in that case, namely, "[u]pon the record before us, ... application of ... the doctrine of unclean hands [is] inappropriate." *See also Tveter v. AB Turn-O-Matic*, 633 F.2d 831, 839 (9th Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 300 (1981); *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77 (6th Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971); *A.H. Emery Co. v. Marcan Products Corp.*, 389 F.2d 11, 18 (2d Cir.), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968); *Chauvin Int'l Ltd. v.*

---

1. The reference is to Chafee, *Coming Into Equity With Clean Hands*, 47 Michigan Law Review 877 (1949).

**228**

*Goldwitz,* 927 F.Supp. 40, 48 (D.C.Conn. 1996).

Based upon all of the evidence adduced at trial, and upon all the evidence adduced in support of the issuance of the temporary restraining orders and the findings of contempt:

1. The defendants, their officers, agents, employees, successors and assigns are permanently enjoined from using on or in connection with, a product known and intended for use as a pet grooming mitt, any false designation of origin, false or misleading representation of fact which is likely to cause confusion or mistake as to the connection of any defendants with the plaintiff regarding any representation that a pet grooming mitt of the defendants is the product "As Seen on TV."

2. Final judgment is directed to be entered in favor of the plaintiff and jointly and severally as against each defendant, excluding Mark Kravits, in the amount of $341,794.

3. Reasonable attorney fees and costs incurred in connection with the two contempt motions brought in this case and incurred in connection with this trial to be computed from affidavits and time sheets upon which attorney fees and costs are claimed, are awarded to the plaintiff.

SO ORDERED.