UNITED STATES of America, Plaintiff,

v.

STATE OF CONNECTICUT,
et al., Defendants.

No. 3:86CV–00252 (EBB).

United States District Court,
D. Connecticut.

June 19, 1996.

Mark Masling, Deval Patrick, Iris Goldschmidt, U.S. Dept. of Justice, Special Litigation Section, Civil Rights Division, Washington, D.C., for U.S.

Linsley J. Barbato, James P. Welsh, Attorney General's Office Education/Mental Retardation Dept., Hartford, CT, for defendants State of Conn., William A. O'Neill, Dept. of Mental Retardation, Brian Lensink, Robert Griffith.

*RULING ON PLAINTIFF'S APPLICATION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CIVIL CONTEMPT*

ELLEN B. BURNS, Senior District Judge.

The Plaintiff United States of America has moved the court to declare the Defendant State of Connecticut officials in contempt of the Consent Decree dated December 22, 1986, and the Court Orders dated April 24, 1990 and December 9, 1991, respectively. For the reasons discussed below, the Plaintiff's motion is GRANTED.

## I. BACKGROUND

On May 1, 1984, the United States Department of Justice (the "DOJ") notified Connecticut officials of the DOJ's intention to investigate the living conditions at Southbury Training School ("STS"),[1] in accordance with

1. STS is an institution for the mentally disabled in the state of Connecticut. As of the hearing on this motion, STS housed 843 residents, making it one of the ten largest institutions of its kind in the United States.

2. CRIPA authorizes the Department of Justice to investigate institutions for the mentally disabled, if credible allegations of unconstitutional conditions of confinement exist.

the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 *et seq.*[2] On September 11, 1985, following its investigation, the Plaintiff brought an action against the State of Connecticut, its governor, the commissioner of the Department of Mental Retardation ("DMR"), and the director of STS, pursuant to CRIPA. In lieu of litigation, the United States and various Connecticut officials[3] entered into a Consent Decree which this court so ordered on December 22, 1986.

The Consent Decree required the Defendants to submit an Implementation Plan (the "Plan") addressing the procedure they would use to implement the Consent Decree's mandates. This court approved the Plan on July 22, 1988. Subsequent to entering into the Consent Decree, the parties agreed to two additional Court Orders on April 24, 1990 (the "1990 Court Order") and December 9, 1991 (the "1991 Court Order"), respectively.[4]

In November, 1993, attorneys for the Civil Rights Division of the DOJ, along with various experts, examined STS's conditions. The DOJ's experts included: Dr. Renee C. Wachtel, M.D., Director of Developmental Pediatrics, and Associate Professor of Pediatrics at the University of Maryland School of Medicine; Dr. Alan E. Harchik, Ph.D.; and Ms. Susan Harryman, Director of the Physical Therapy Department at the Kennedy Krieger Institute, and Instructor in the Department of Pediatrics at the John Hopkins University School of Medicine. All of the experts' findings indicated that STS was not complying with the Remedial Orders. (*See* Pl.Exs. 4, 8, and 22.)

On June 20, 1994, the Plaintiff sent the experts' findings to the Defendants, together with a letter alleging that the Defendants were not in compliance with the Remedial Orders. The Plaintiff also included a list of

3. The Connecticut officials included: William A. O'Neill, Governor; Brian Lensink, Commissioner, Connecticut Department of Mental Retardation; Robert Griffith, Director, Southbury Training School; and Joseph I. Lieberman, Connecticut Attorney General.

4. The court will refer to the Consent Decree, Plan, and two Court Orders collectively as the "Remedial Orders."

actions that the Defendants should take to remedy the alleged violations.

In response, the Defendants retained a group of experts to examine the Plaintiff's experts' findings, and to make independent findings and suggestions. The Defendants' experts included: Dr. Fred Volkmar, M.D., Professor of Child Psychology at the Yale University Child Study Center; Dr. Henry Schneiderman, M.D., F.A.C.P.; Dr. James E.C. Walker, M.D., Professor of Medicine, Emeritus, at the University of Connecticut; Ms. Rhea Sanford, R.N., M.S.N., Clinical Nurse Specialist at the John Dempsey Hospital of the University of Connecticut Health Center; and Ms. Karen Green McGowan, R.N., Clinical Nurse Consultant. After the Defendants' experts concluded their examination, counsel for the respective parties met to discuss a possible resolution of the Plaintiff's contempt allegations. The Plaintiff proposed two principle measures to remedy the Defendants' alleged contempt: appointment of a Special Master to increase the level of monitoring of conditions at STS, and a significant reduction of STS's population within three years. Despite extensive discussions, the parties failed to reach an agreement.

Subsequently, the Plaintiff filed the instant application for an order to show cause why the Defendants should not be held in contempt. This court held four days of hearings on the Plaintiff's application, during which the Plaintiff presented expert testimony regarding the Defendants' alleged noncompliance; and the Defendants presented testimony from several of its employees.

## II. DISCUSSION

### A. LEGAL STANDARD

■ Courts have the inherent power to hold a party in civil contempt "to enforce compliance with an order of the court, or to compensate for losses or damages." *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.1981) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499–500, 93 L.Ed. 599 (1949)). Also, 18 U.S.C. § 401 gives federal courts the "power to punish by

fine or imprisonment, at its discretion, such contempt of its authority, and none other, as ... (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

■ A finding of contempt is appropriate when: (1) the court order's provisions are clear and unambiguous; (2) the moving party establishes noncompliance by clear and convincing evidence; and (3) the defendant has not exercised reasonable diligence in attempting to comply. *International Longshoremen's Assn. v. Philadelphia Marine Trade Assn.*, 389 U.S. 64, 75–76, 88 S.Ct. 201, 207–08, 19 L.Ed.2d 236 (1967); *EEOC v. Local 638*, 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). Furthermore, because sanctions for civil contempt are remedial in nature, a court may find a party in contempt, irrespective of whether that party intended to comply with the court's order. *McComb v. Jacksonville Paper Co.*, 336 U.S. at 191, 69 S.Ct. at 499–500; *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir.1989) (court declares that "sanctions for civil contempt can be imposed without a finding of wilfulness.") (citations omitted).

### B. FINDINGS OF NONCOMPLIANCE

■ At the hearing, and in its papers, the Plaintiff alleged that the Defendants were violating the Remedial Orders in three areas: Psychological services, medical services, and physical therapy services. The court will address each of these areas in turn.

#### 1. Psychological Services

Psychological services are critical to the residents' development at STS. The Remedial Orders set forth in detail numerous requirements regarding STS's psychological services. Among other things, STS is required to provide:

> Training programs professionally designed to reduce or eliminate unreasonable risks to personal safety or unreasonable use of restraints and developed by qualified professionals ...[5]

---

**5.** The Remedial Orders also mandate the following: Consent Decree § I(2) (requires provision of

that degree of care which is sufficient to protect all residents from unreasonable risks to their

Consent Decree § I(1). As shown in its compliance reports, STS has developed an overall plan of services ("OPS") for its residents, thereby complying with the letter of the Remedial Orders. However, STS fails to satisfy the *spirit* of the Remedial Orders, as its implementation of the overall plan of services has not yielded the required results.

For example, STS has a written behavior plan for most of its residents, which, in part, requires psychology staff members to conduct behavior assessments to determine the possible conditions that both lead to and maintain challenging problem behaviors. Yet, STS's records show that assessments are not being performed regularly, and when they are performed, they rarely generate useful information or actions. At the hearing, and in his report, Dr. Alan Harchik explained that many of the behavior assessments he reviewed were several months old, and identical rewrites of previously conducted analyses. (Pl.Ex. 22 at 6.) Further, he noted that of the twenty-one cases he reviewed, there was little relation between the analyses and the treatment procedures. More specifically, he described several cases in which the patients were either not showing any progress or were regressing, but no further action was taken. (*Id.*)

STS's behavior plans also required staff members to implement an "ignore and redirect" procedure when confronted with maladaptive behavior. Yet, the plans did not specify whether the *behavior* or the *resident* should be ignored, what the resident should be redirected to do, or what the staff should do if the behavior continued but restraint was not required. Consequently, "staff members *always* paid attention to residents when they exhibited problem behavior by making statements to the resident about the problem behavior ... [but failed] to redirect them to something more appropriate or to engage in an alternative behavior or activity." (*Id.*)

A September, 1994 report on the death of Stanley B. shows clearly STS's delinquency in implementing treatment procedures to address problems discovered during behavior assessments. Stanley B. was one of STS's approximately twenty smoking residents. STS's staff was well aware that he was "a 'sloppy' and at times careless smoker who sometimes burned holes in his clothing." [6] However, Stanley B.'s 1993 OPS did not provide any instruction to the staff regarding his smoking habits, or his need for supervision while smoking. (Pl.Ex. 12, Final Investigation Report of Thomas Harmon at 9–10 [hereinafter "Harmon Report"].)

In 1989, STS staff developed an OPS for Stanley B. which established a goal to teach him to extinguish his pipe in a safe manner.[7] To achieve that goal, he had to complete a series of smoking-related tasks, independently, during eight consecutive training sessions. (Harmon Report at 11.) However, only two quarterly reports regarding this goal were found, neither of which indicated that Stanley B. was progressing. Moreover, although a later report indicated a slight decrease in his

---

personal safety both by the conduct of staff, and of other residents); Consent Decree § I(4) (requires STS to prescribe and administer behavior modifying medications pursuant to the exercise of professional judgment); Consent Decree § V(3) (requires STS to provide a sufficient number of training program hours for each resident); Consent Decree § V(5) (requires STS to maintain adequate records); Consent Decree § V(8) (requires that restraints and behavior modifying medications not be used in lieu of training programs); 1991 Court Order § 1(A) (requires modification of training plans when necessary); and 1990 Court Order § 1(U) (requires, when appropriate, "the Interdisciplinary Team, within 30 days of each review, [to] modify the existing Overall Plan of Service of such residents in accordance with professional judgment of qualified professionals.").

6. In the past, Stanley B. failed to pay attention to the end of his cigarette, and hot ash would fall on, and burn, his clothing. Eventually, staff members limited his smoking to a pipe. Despite such limitation, Stanley B. was still careless in packing his pipe with tobacco, often spilling loose tobacco on the floor and his clothing. (Pl. Ex. 12, Final Investigation Report of Thomas Harmon at 9–10 [hereinafter "Harmon Report"].)

7. The goal entailed teaching Stanley B. to pack his pipe neatly, dump the pipe's hot ash in an ash-tray, place his pipe in a fire-proof container in his gym bag, and clean up after himself. (Harmon Report at 11.)

performance, STS staff did not take any action to address the problem.[8]

On the morning of April 2, 1994, Stanley B.'s clothing caught on fire while he smoked his pipe. As a result, he suffered burns to one-half of his body, and died later that evening.

The Health Care Financing Administration's (the "HCFA")[9] October, 1994 survey also evinces STS's inability to implement its programs effectively. In its report, the HCFA stated that its inspection indicated STS was not providing continuous, aggressive, and active treatment programs. (Pl.Ex. 19, HCFA Cottage 34 Survey at 1.) Furthermore, HCFA noted that its survey was the fourth consecutive survey to yield such results. (*Id.*) HCFA then discussed several instances in which pica programs[10] for several clients were either lacking, or not being implemented as written at their day programs: (1) A staff interview indicated that Client # 07 ingested a piece of plastic at her day site (Pl.Ex. 19, HCFA Cottage 32 Survey at 5); (2) during a one-hour observation, Client # 09 was observed to ingest feathers from a duster, and lacked involvement in a routine (*id.*); (3) Client # 08 lacked the implementation of the "eye-gouging" component of her behavior program (*id.* at 6); (4) Staff observed Client # 08 stick her finger in her eye, but did not redirect her to remove it as indicated in her behavior program (*id.*); (5) observation and documentation indicated that Client # 02's behavior program to reduce his self-injurious behavior of hitting his head with his hands was not implemented as

written (Pl.Ex. 19, HCFA Cottage 34 Survey at 2); (6) a review of Client # 06's behavior data since the implementation of his program designed to prevent incidents of ingesting cigarette butts indicated that Client # 06 ingested cigarette butts at least seventy-eight times between June 17, 1994 and January 1, 1995 (Pl.Ex. 19, HCFA 26 Colony Ct. Circle Survey at 2); (7) STS's failure to implement its procedure to keep toxic substances out of reach of the client resulted in Client # 03 ingesting a water and bleach mixture (Pl.Ex. 19, HCFA Cottage 22 Survey at 2); and (8) although Client # 02 fell three hundred and twenty-four times between January, 1994 and October, 1994, STS lacked programming to address this behavior. (Pl.Ex. 19, HCFA Cottage 34 Survey at 2.)

STS has not only failed to protect its residents from injury to themselves, but has also failed to protect its residents from unreasonable risk of injury by other residents. A cursory review of STS's accident report for the year beginning September 1, 1993 reveals numerous incidents of residents' acts of aggression toward their peers.[11] While the court acknowledges that a facility such as STS is not able to prevent every incident, the court notes that numerous incidents listed in STS's accident reports occurred on several occasions. (Pl.Ex. 20.)[12]

The court, however, finds that STS's accident reports are misleading, when viewed in isolation. When the court juxtaposes STS's reported and substantiated abuse and neglect allegations between 1992 and 1994 with those

---

8. When Mr. Harmon questioned STS officials about the termination of Stanley B.'s training, they reasoned that "it could have been realized that the goal was beyond achievement or that other needs were more important. The record, however, did not indicate why attempts to teach [Stanley B.] safe-smoking habits were abandoned, or how his need to 'smoke safely' would otherwise be addressed." (Harmon Report at 12.)

9. HCFA conducts periodic examinations of those facilities for the mentally disabled receiving federal funding.

10. Pica is an abnormal desire to ingest substances not normally eaten.

11. For example: (1) A resident knocked Claire to the floor; (2) a resident pushed Karyn to the

floor; (3) a resident punched Ray in the chest; (4) a resident hit Mary on the head; (5) Charlie punched a staff member in the back of his head; (6) a resident punched Judy in the eye; (7) a resident threw Alicia to the ground; and (8) a resident grabbed Brenda's head, and bit out a mouth full of hair. (Pl.Ex. 20.)

12. For example: (1) A resident slapped Stella two times in two days; (2) James headlocked another resident on three separate occasions in one day; (3) a resident slapped Lillian D. on the head five times; (4) a resident head-butted Christine O. three times; (5) a resident slapped David W. in the face two times; and (6) a resident slapped Richard W. in the face two times. (Pl. Ex. 20 and selected accident reports.)

of the other institutions in the DMR's six regions, the court finds STS's number to be the lowest. (*See,* Def.Exs. AB and AC.) Of course, such a comparison does not exonerate STS from its duty to minimize accidents. However, STS appeared to be combating the problem more effectively than any of the other institutions in the region.

Although positive reinforcement is one of the most effective, efficient, and nonaversive procedures available for dealing with such maladaptive behavior, it is not a standard part of STS's behavioral programs. Further, when STS did include positive reinforcement in a behavior plan, attempts by the psychology and direct-care staff to implement the procedure demonstrated a "total lack of understanding of positive reinforcement." (Pl. Ex. 22 at 7.) For example, the staff allowed one resident to perform preferred chores to reinforce appropriate behavior, and directed him to do the same chores when he became agitated. In another case, a resident, who was restrained at least once a day for exhibiting aggressive behavior, received his reinforcement snacks despite his disruptive conduct. Yet another resident's behavior plan called for reinforcement every five minutes, but the staff member did not administer the procedure, reasoning that it does not work. "By not applying the simplest, most basic principles of intervention and positive reinforcement, residents at STS are not receiving a suitable training program." [13] (Pl.Ex. 22 at 7.)

Another flaw in STS's psychological services is its failure to keep its residents actively engaged. Dr. Harchik performed a study across eleven cottages to determine the number of residents engaged at any given time.[14]

He found that the residents were "almost never engaged." (Pl.Ex. 22 at 11.) In fact, the average percentage of residents engaged across the eleven cottages was 31%, an extremely low average by professional standards.[15] Instead of engaging the residents in activities, staff members were observed watching TV, talking on the telephone, talking to each other, and engaging in other miscellaneous activities. (Pl.Ex. 22 at 11–13.)

STS has failed to discover and address such systemic defects, because its staff does not execute STS's "review and modify" procedures regularly. Once again, STS is in compliance with the letter of the Remedial Orders, but fails to produce the results. As dictated by the Remedial Orders, STS procedural guidelines require that its staff hold regular monthly reviews of behavior treatments for those residents receiving medication, and that a doctoral-level psychology staff conduct monthly reviews of specific behavior plans ("QA reviews"). Also, an interdisciplinary team is required to perform a quarterly review of all plan objectives. Furthermore, STS's Program Review Committee (the "PRC") is required to review those residents receiving behavior medications at least every two years. (Pl.Ex. 22 at 9.) However, while at least half of the behavior programs he reviewed required modification,[16] the QA reviews performed prior to his report did not recommend modification of *any* existing behavior plans.[17] (Pl.Ex. 22 at 9.)

Finally, the Defendants violate the Remedial Orders by administering behavioral medication in lieu of training programs. The Defendants' own expert found that STS administered psychotropic medications for be-

---

13. Dr. Harchik also noted the conspicuous absence of positive staff interaction with the residents. He stated that he observed fifty staff members across eleven settings, and found only one interacting with the residents.

14. Every ten to fifteen minutes Dr. Harchik would count systematically the number of residents who were engaged. Dr. Harchik's definition of "engagement" included any active participation in an activity (i.e., looking at magazines, eating dinner, and playing with toys). (Pl.Ex. 22 at 11–12.)

15. Dr. Harchik stated that "80% or lower is considered to be problematic by professional standards." (Pl.Ex. 22 at 12.)

16. Dr. Harchik found that the patient's behavior was either worsening or not progressing.

17. Dr. Harchik stated that STS's "clinical response to behaviors worsening appear[ed] to be to look to obtaining a better diagnosis ... or changing medications.... There appears to be little focus upon modifying environmental conditions and intervention procedures." (Pl.Ex. 22 at 9.)

havior problems when behavioral programs were more appropriate. Dr. Fred Volkmar found that:

> Psychiatric services at STS appeared to be entirely focused on issues of medication ... Essentially, there appear to be no psychiatric services other than those related to medications, e.g., no in-service training, no supervision, no psychotherapy, no consultation regarding psychiatric aspects of medical conditions, and so forth. Psychiatrists are not really active members of the treatment teams but rather are brought in as, in effect, outside consultants. The psychiatric consultations are not well integrated with other aspects of the rehabilitation and medical program.

> This has had the unintended effect of "marginalizing" psychiatry at STS with consequent implications for the quality of service which is provided.

Report of Dr. Fred R. Volkmar at 6 [hereinafter "Volkmar Report"].

### B. Medical Services

The Remedial Orders require that STS provide adequate medical care to all of its residents.[18] Several of the experts' reports and STS compliance reports reveal that STS has established a substantial number of medical programs. However, clear and convincing evidence shows that the Defendants' medical services at times violate the Remedial Orders' requirements, thereby placing residents in grave danger.

Perhaps the most blatant example of STS's failure to provide adequate medical care is found in the various reports on the death of John T.[19] In caring for John T., STS's medical staff made a series of severe errors which possibly contributed to his ultimate death. Among those errors were the following: (1) STS staff's management of diarrhea and severe malnutrition in June, 1992 was delayed and inadequate;[20] (2) John T.'s physician, one Dr. Guevarra, failed to diagnose his deteriorating condition in a timely or adequate manner, during the last ten days of August, 1992;[21] (3) on the day of John T.'s death, STS staff failed to recognize that he had lapsed into unconsciousness for several hours;[22] (4) Dr. Guevarra failed to question why John T. was receiving an extraordinarily high dosage of Dilantin (three times as high as his normal dose);[23] (5) Dr. Guevarra failed to check John T.'s blood to determine whether he was carrying a toxic level of Dilantin;[24] (6) Dr. Guevarra did not provide clearly defined orders regarding John T.'s medicine prescription;[25] (7) Dr. Guevarra prescribed a "cocktail of medications" with-

---

18. The Consent Decree provides in relevant part: § I(3) (adequate medical care shall be afforded all residents pursuant to the exercise of professional judgment by a qualified professional); § I(4) (behavior modifying medications and other medications must be prescribed and administered to residents pursuant to the exercise of professional judgment by a qualified professional); and § V(5) (plan shall be established setting forth the record keeping systems, policies, and procedures with respect to each patient's care, medical treatment, and required training that shall be utilized to maintain and make available in each resident's record such information as is professionally necessary to permit the exercise of professional judgment in that resident's care, medical treatment, and training).

19. One report described STS's treatment of John T.'s medical condition as "plagued with medical flaws that may have contributed to precipitating [his] death.... Upon return to STS in a debilitated but stable condition, John T.'s evaluation by his [primary care physician] failed to assess and address important aspects of his medical condition." Memorandum of Miguel Aquino at 3 [hereinafter "Aquino Memo"].

20. Report on John T. by Dr. Rene Jahiel, STS Medical Director, at 1 [hereinafter "Jahiel Report"].

21. *Id.*

22. *Id.*

23. Dr. Jahiel stated that a "thorough review and investigation on arrival should have revealed the excessive dosage of [D]ilantin and may have clarified the pathological processes ongoing in this patient, including the cause of his apparently severe pain." (Jahiel Report at 6.)

24. Aquino Memo at 4.

25. Dr. Guevarra ordered that John T. receive Demerol for "severe pain," Ativan for "agitation", and Tylenol for "mild pain." However, Dr. Guevarra did not clearly define what constitutes the respective levels of pain. Consequently, the amount of medicine given was left open to interpretation, and thus unpredictable. *Id.*

out regard to the detrimental effects of ordering multiple medications.[26]

As shown above, STS's care of John T. was plagued with appalling examples of insufficient medical care, and such systemic inadequacies might be sufficient alone to find the Defendants in contempt of the Remedial Orders. However, the court will discuss several additional examples below.

STS's maintenance of its active and inactive problem lists is inadequate. Active and inactive problem lists are a crucial part of effective medical care. Report of Karen Green McGowan at 4 [hereinafter "McGowan Report"]. Problem lists provide an accurate picture of a patient's current and past health history. (*Id.*) Furthermore, such lists are very useful to medical consultants, and when STS refers a patient to a new physician. (*Id.*) Conversely, problem lists are utterly useless if they are not accurate. At STS, most of the patients that the experts observed had problem lists. However, the majority of the lists reviewed were either incomplete or inaccurate.[27] (McGowan Report at 4.)

STS's recordkeeping procedures are also below professional standards, causing important medical information to be obscured, and jeopardizing its residents' health. Ms. McGowan found that STS was attempting to maintain the residents' medical records. Nevertheless, she explained that it took her from one and one-half to two hours per client to retrieve information in the client's record, because there was "[t]oo much crucial information in too many places, much of which [was] either incomplete, repetitive or inconsistent." (McGowan Report at 3.) Also, the HCFA's report cited several cases of primary care physicians altering patients' medication without informing the interdisciplinary team, and patients' medication records not accurately reflecting the actual dosage of medication that the patients were receiving.[28]

Even when medical concerns were properly listed in a patient's record, STS often failed to follow-up with the appropriate medical care. For example, in several instances, medical records indicated that patients were experiencing significant weight loss, but STS failed to take action.[29] (McGowan Report at 11; Pl.Ex. 4 at 14, 15, 16, and 21.) On other occasions, patients were diagnosed as having serious illnesses, but inadequate medical action was taken. (Pl.Ex. 4 at 13.)

Dr. Volkmar noted that STS's system for prescribing medication was at times "*very complicated,*" and had "possible medical-legal implications." (Volkmar Report at 7–8.) He explained that there were at least six partici-

---

**26.** Dr. Guevarra did not consider, nor did he alert his nursing staff to, the possibility that such a mixture could result in restlessness, insomnia, and self-abusive behavior. Consequently, when John T. exhibited such behaviors, they "were all regarded signs of pain and ... due to [Dr. Guevarra's] initial oversight that failed to consider the potential deleterious effect of the cocktail of medications, the possibility that unusual behavior ... could represent toxicity was never considered." As a result, the administering of medications never ended. *Id.*

**27.** Ms. McGowan reviewed eight lists and found that seven of them were either incomplete or inaccurate. (McGowan Report at 4.) Dr. James Walker stated that the "medical records 'problem lists' are not current and progress notes do not indicate the problem being addressed, making review cumbersome and open to oversight. This problem is multiplied by the number of disciplines using the progress notes." Report of Dr. James E.C. Walker at 1 [hereinafter "Walker Report"]. Moreover, a Quality Assurance Review Summary completed by an STS medical staff member revealed the following:

[I]n twenty-five percent of cases, all significant past illnesses were not listed and ... diagnostic procedures were not listed in about thirty-three percent of the active problem lists. In regard to health case unit admissions, ten to twelve percent of residents did not have daily progress notes for at least the first three days after admission.

(Pl.Ex. 4 at 25.) *See also*, Pl.Ex. 4 at 8, 9, 26–27 (Dr. Wachtel cites other findings of poor problem lists).

**28.** Client # 02's medical records showed that, as of December 13, 1994, he was receiving ten mg. of Pindolol daily, when, in actuality, he had been receiving fifteen mg. daily for nearly a month. In another case, Client # 03's primary care physician increased his dosage of Tranxene from three to four times a day, but the increase was not reflected in Client # 03's medical records for over three months. (Pl.Ex. 19, HCFA 26 Colony Ct. Circle Survey at 6.)

**29.** Ms. McGowan noted that unplanned weight loss in an environment like STS is almost always indicative of other health issues. (McGowan Report at 11.)

pants involved in any transaction related to medication, which at times decreased the quality of patient care. The participants included: (1) the client, (2) his/her parent or guardian, (3) the psychiatrist, (4) the primary care (prescribing) physician, (5) the treatment team, and (6) the program review committee (the "PRC") "which functioned as the final arbiter for medication decisions." (Volkmar Report at 7.) Dr. Volkmar explained that, although the rationale behind such an elaborate process was to ensure quality care, the process "appeared, at times, to have the opposite effect in that quality of care was potentially *worsened.*" (Volkmar Report at 7.)

He described one instance in which an elderly patient's psychiatrist requested that the patient's tranquilizing medication be changed in light of his Parkinsonian symptoms. However, the PRC not only disapproved of the psychiatrist's request, but also "preapproved" a virtually opposite request of *increasing* the patient's current medication. Dr. Volkmar stated that "as far as could be determined no member of the PRC had *ever seen* the patient and ... with the exception of a single physician on the PRC (who presumably was not paying attention) other members would essentially not have been aware of the issues involved." (*Id.*)

Dr. Volkmar concluded that:

The implications of unqualified (e.g., unlicensed) personnel, in effect, making major

decisions regarding pharmacological interventions is problematic. The use, as in the case noted above, of "preapproval" of certain drug regimens by PRC is (presumably) theoretically intended to shorten the review process; it has the most unfortunate effect of undercutting the relationships of the physician and his/her patient by well meaning individuals who basically do not know the patient.... [This practice] appeared to cross the boundary of acceptable practice.

(Volkmar Report at 7–8. *See also* Pl.Ex. 4 at 10.)

## C. Physical Therapy Services

The Remedial Orders require that STS provide adequate physical therapy services for those residents in need of such services. Adequate physical therapy is critical at an institution such as STS, as it serves to prevent physical degeneration, body deformities, and abnormal growth.[30]

At the hearing, and in her report, (Pl.Ex. 8), Ms. Harryman revealed clearly that, as of her inspection on November 15–17, 1993, STS's physical therapy services had a plethora of deficiencies that violated the Remedial Orders. Indeed, she found that nearly every aspect of STS's physical therapy services was below professional standards. Ms. Harryman opined that STS's grossly inadequate staffing was the primary cause of its poor physical therapy services. She explained that, in 1993, a mere seventeen of the 244

**30.** The Remedial Orders mandate the following: Consent Decree § V(4) (procedures shall be used to "reasonably ensure that there is consultation and communication of relevant information between and among personnel regarding residents' care, training needs and priorities ... and that such information is communicated to staff who provide care for that resident"); Consent Decree § V(5) (mandates that record keeping systems, policies, and procedures with respect to each patient's care, medical treatment, and required training be utilized to maintain and make available in each resident's record such information as is professionally necessary to permit the exercise of professional judgment in that resident's care, medical treatment, and training); Consent Decree § V(6) (requires that measures be taken "to provide adequate medical care, including evaluation of residents with physical disabilities, and the specific steps that will be undertaken to provide appropriate medical and physical therapy services to prevent contractures, physical de-

generation, and inappropriate body growth and deformity"); 1990 Court Order § 1(F) (requires the Defendants to provide "appropriate physical therapy to each resident with physical handicaps for whom a program of physical therapy has been ordered by a qualified professional, and ensure records of such treatment are made and entered in the resident's medical record"); and 1990 Court Order § 1(G) (requires the Defendants to have a qualified physician assess each physically disabled resident "to determine whether a physical therapy program should be initiated or an existing physical therapy program modified to prevent contractures, physical degeneration, and inappropriate body growth and deformity." The physician is then required to refer those residents in need to a registered physical therapist. Within forty-five days from such referral, the physical therapist is required to "assess and evaluate each resident so referred and develop a written physical therapy program for each of them.").

residents receiving physical therapy services were receiving assistance from licensed physical therapists ("PT"). The remaining residents were forced to receive training from unlicensed rehabilitation therapy assistants ("RTA"). She concluded that such staffing "precludes residents in need of physical therapy from receiving adequate care." (Pl.Ex. 8 at 4.) STS has, however, taken steps to remedy this deficiency.[31]

Although licensed PTs planned the services that the RTAs administered, STS did not have objective guidelines for monitoring the delivery of physical therapy services, or an established methodology for documenting procedure implementation. Consequently, the RTAs and direct care staff often provided physical therapy services without the requisite guidance. (Pl.Ex. 8 at 4.) Furthermore, STS's training procedures did not provide guidelines for determining staff competence prior to allowing such staff to administer physical therapy services. As a result, residents were in danger of receiving physical therapy from incompetent personnel.[32] (Id.)

While STS has guidelines and procedures for determining when implementation and/or termination of physical therapy is appropriate, it fails to implement them consistently. At the hearing, Ms. Harryman testified that STS has a procedure for evaluating residents which consists of eight components. However, when she reviewed ten STS physical therapy evaluations, she found that only 36% of the required components were covered in all of the evaluations. (Pl.Ex. 8 at 6.) Further, few of STS's evaluations included goals regarding physical therapy treatment. Thus, it is clear that STS's staff was not assessing the effectiveness of its physical therapy services, or modifying such services, when appropriate. This deficiency placed the patients at risk of receiving ineffective, useless, and detrimental therapy.[33] In fact, STS's inadequate physical therapy services have caused several residents who, only a few years earlier, were ambulatory, to be permanently bedridden.

Finally, STS fails to make effective use of its general physical therapy protocols.[34] Professional standards require that "all physical therapy protocols be dated and reviewed regularly." (Pl.Ex. 8 at 7.) A review of STS's general physical therapy protocols evinced that STS had failed to document or make any additions or revisions to any of its general protocol reviews in nearly one and a half years. Further, in some instances, protocols were not available for patients at all. (Pl.Ex. 8 at 7.)

## C. RULING ON CONTEMPT AND REMEDIES

The court finds by clear and convincing evidence that the Defendants are in contempt of the Remedial Orders.[35] Although STS's quarterly reports reveal that it was in

---

**31.** DMR entered into a two-year contract, effective from August 25, 1995, for the provision of 240 hours per week of physical therapy, speech/language therapy, and occupational therapy services, the equivalent of six full-time positions.

**32.** Indeed, Ms. Harryman found that a "severe systemic problem at STS is that indirect physical therapy services ... are implemented by people who are not adequately trained on a regular basis and who do not carry out adequate physical therapy treatment." (Pl.Ex. 8 at 4.) Ms. Harryman reviewed a video-tape which STS uses to train RTAs, and found it to be cursory and incapable of providing sufficient information to ensure safe and appropriate delivery of physical therapy. (Pl.Ex. 8 at 9.) Moreover, Ms. Harryman observed two RTAs implementing physical therapy, and, in both instances, the RTA's procedures were administered incorrectly, thereby placing the resident in risk of physical maladies (i.e.,

contractures, deformity, musculoskeletal injury). (Pl.Ex. 8 at 7–8.)

**33.** Also STS's procedures do not provide for annual physical therapy assessments of clients. This, too, prevents STS from determining the effectiveness of its services. Ms. Harryman opined that "[r]e-evaluation on less than an annual basis is not adequate for any client receiving physical therapy services, which is a major concern in a facility where multiply handicapped residents receive primary therapy services from unlicensed and minimally trained personnel." (Pl.Ex. 8 at 5.)

**34.** A protocol is a detailed plan of physical therapy treatment or procedure.

**35.** The court notes that some of the most compelling evidence came from the Defendants own experts.

compliance with over 90% of the Remedial Orders' requirements,[36] such "compliance" was not effectuating the Remedial Orders' desired results. Indeed, STS's systemic flaws have caused many residents to suffer grave harm, and, in several instances, death.

■ To insure that the Remedial Orders' purposes are satisfied in the future, the court will appoint a special master to review STS's operations. It is well settled in the law that federal courts have the inherent power to appoint an agent to oversee the implementation of its consent decrees. *In re Peterson,* 253 U.S. 300, 312–13, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920). Indeed, this "court has an affirmative duty to protect the integrity of its decree. *This duty arises where the performance of one party threatens to frustrate the purpose of the decree." Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985) (emphasis added) (quoting *Stotts v. Memphis Fire Dept.,* 679 F.2d 541, 555 (6th Cir.1982), *rev'd on other grounds sub nom., Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (footnote omitted)).

■ While Federal Rule of Civil Procedure 53(b) requires that the appointment of a special master be the exception rather than the rule, it does not "terminate or modify the district court's inherent equitable power to appoint a person ... to assist it in administering a remedy." *Ruiz v. Estelle,* 679 F.2d 1115, 1161 (5th Cir.1982). Rather, "[b]eyond the provisions of [Fed.R.Civ.P. 53] for appointing and making references to Masters, a federal district court has the inherent power to supply itself with [a special master] for the administration of justice when deemed by it essential." *Id.* at 1161 n. 240 (citing *Schwimmer v. U.S.,* 232 F.2d 855, 865 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956) (citation omitted)). *See also, Juan F. v. Weicker,* 37 F.3d 874, 876 (2d Cir.1994) (court appointed a monitoring panel, and later a single monitor, to oversee consent de-

cree, "because of the difficult issues involved, as well as the importance to the plaintiff class of enforcing the decree."); *Berger v. Heckler,* 771 F.2d at 1568 (holding that court's desire to protect the integrity of its decree "justifies any reasonable action taken by the court to secure compliance."); *Stone v. San Francisco,* 968 F.2d 850 (9th Cir.1992) (stating that district courts are permitted to appoint a special master to oversee a consent decree); *Local 28 of Sheet Metal Workers v. EEOC,* 478 U.S. 421, 482, 106 S.Ct. 3019, 3053, 92 L.Ed.2d 344 (1986) (Court recognized the "difficulties inherent in monitoring compliance with the court's orders," and, thus, found the appointment of an administrator "well within the District Court's discretion."); *Kendrick v. Bland,* 740 F.2d 432, 438 (6th Cir.1984) (holding that a court may appoint a "monitor to observe defendants' conduct and thereby permit the federal court to oversee compliance with its continuing order.").

■ An appellate court will not disturb a district court's decision to appoint a special master, unless a clear abuse of judicial power is shown. Further, deference to the district court's exercise of discretion is heightened where, as here, the court has been overseeing a large, public institution for a long period of time. *Stone,* 968 F.2d at 856 (citing *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)). *See also Hutto v. Finney,* 437 U.S. 678, 688, 98 S.Ct. 2565, 2572, 57 L.Ed.2d 522 (1978) (Court gave substantial deference to district court's years of experience overseeing prison system).

■ In the instant case, the court finds that the complex nature of the case, together with the delicate interests of STS's residents, call for the appointment of a special master to determine why STS's efforts are not producing the Remedial Orders' intended results, and to make recommendations to the

---

**36.** The court does not agree with the Plaintiff's contention that the compliance reports are not pertinent to the instant matter. Rather, the court finds the compliance reports to be a suitable starting point in determining whether the Defendants are complying with the Remedial Orders. Moreover, the court notes that the Plaintiff consented to the Defendants' submission of compliance reports, (Consent Decree § V), and, heretofore, had never contested the appropriateness of the court using such reports as a measure of compliance. Thus, the court will not permit the Plaintiff to contest the validity of the compliance reports at this time.

court. In addition, if the special master deems it necessary, the court will appoint an expert review panel, comprised of one expert in each of the three areas discussed above, to assist the special master in making findings and recommendations. The special master shall take the following actions: (1) conduct an immediate and thorough review of all aspects of STS's care and treatment of residents covered by the Remedial Orders to determine the changes needed to meet the Orders' desired ends; (2) formulate specific methods to implement the required changes; and (3) work with the parties to effectuate those changes.

The Plaintiff and Defendants shall report to the court, either jointly or severally, their recommendation(s) for appointment as special master on or before July 15, 1996. The court shall make the final determination.

SO ORDERED.